**ATTACHMENT A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **NEFRETITI MAKENTA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 06-1093 (JR) |
| vs. | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT ACS GOVERNMENT SYSTEMS, INC.
## MOTION FOR SUMMARY JUDGMENT

Defendant ACS Government Systems, Inc. (hereinafter "ACS"), by and through

undersigned counsel, moves this Court pursuant to Fed. R. Civ. P. 56( c) for an order of summary

judgment in the above-captioned matter. As reasons for the grant of this motion, ACS cites the

accompanying memorandum of points and authorities.

Counsel for Plaintiff does not consent to the grant of the instant motion.

Respectfully submitted,

/s/ Frederick D. Cooke, Jr.

Frederick D. Cooke, Jr., D.C. Bar No. 164608
Rubin, Winston, Diercks, Harris & Cooke, LLP
1155 Connecticut Avenue, NW, Suite 600
Washington, D.C. 20036
202 861 0870
202 429 0657 (facsimile)

Counsel for
ACS Government Systems, Inc.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NEFRETITI MAKENTA,     )
                    )
      Plaintiff,     )
                    )
                    )     Civil Action No. 06-1093 (JR)
vs.               )
                    )
DISTRICT OF COLUMBIA, et al.,     )
                    )
      Defendants.     )

## DEFENDANT AFFILIATED COMPUTER SYSTEMS
## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In support of its motion for summary judgment filed herein, Defendant ACS Government

Systems, Inc. (hereinafter "ACS"), by and through undersigned counsel, states as follows:

### Background

Plaintiff Nefretiti Makenta ("Plaintiff") was arrested on April 12, 2005 and charged with

destroying public property (a parking meter) in violation of D.C. Code section 22-303 (2001

Ed.). Complaint at ¶ ¶ 8 and 11. The arrest of Plaintiff stemmed from a surveillance operation

that was being conducted by officers of the Metropolitan Police Department (hereinafter

"District"). Exhibit 1, Deposition of Officer David Carter, at 57:10-22 and 58:1-11. The

surveillance operation was being conducted in an area of the city where working parking meters

had frequently been rendered inoperable. Exhibit 1 at 8:20-22 and 9:1-7. Prior to beginning the

surveillance operation, each of the parking meters on the street was inspected by Metropolitan

Police Officers and by representatives of ACS to determine if they were operable. Exhibit 2,

1

Deposition of Aaron Gamble, at pp. 45-51. Exhibit 1 at 13:3-8 and 40:14-17. All of the parking meters on the street on which Plaintiff was arrested, including the parking meter that Plaintiff was charged with destroying, were found to be operating properly. Exhibit 1 at 59:7-9. Exhibit 2 at 49: 18-21.

Officer Carter and ACS employee Aaron Gamble observed Plaintiff approach one of the parking meters, and put something into the parking meter. Exhibit 1 at 23:15-22 and Exhibit 2 at 67:4-7. Plaintiff walked away from this parking meter, Officer Carter and Mr. Gamble saw the fail sign flash on the parking meter. Exhibit 1 at 27:4-12 and Exhibit 2 at 71:1-7. The fail sign had not been flashing on the parking meter before Plaintiff was seen putting something into the parking meter. Exhibit 1 at 45:6-8 and 46:6-8. Exhibit 2 at 71:1-7.

Immediately after Plaintiff left the parking meter, Mr. Gamble inspected the parking meter and saw a piece of paper in the coin track of the parking meter. Exhibit 2 at 71:1-7. Mr. Gamble saw a piece of paper in the coin track of the parking meter. Exhibit 2 at 71:20. Mr. Gamble pointed out to Officer Carter the piece of paper that was in the coin track of the parking meter. Exhibit 2 at 74:19-22.

Officer Carter believed that Mr. Gamble had a totally unobstructed view of Plaintiff putting something into the parking meter. Exhibit 1 at 49:3-9. Mr. Gamble showed Officer Carter the piece of paper in the coin track of the parking meter. Exhibit 2 at 74:19:22. Subsequently, Mr. Gamble opened the parking meter and showed the piece of paper that was jammed in the coin track of the meter to Plaintiff. Exhibit 2 at 76:18-22.

Based on his own observations and those of Mr. Gamble, Officer Carter arrested Plaintiff for destruction of public property. Exhibit 1 at 37: 14-18 and 51:7-16.

2

Officer Kenneth Boone testified that when he first arrived Officer Carter and the ACS employees had already initiated contact with Plaintiff. Exhibit 4, Deposition of Kenneth Boone at 20:15-22 and 21:1. Officer Boone did not personally observe Plaintiff's actions regarding the parking meter, but he had no reason to disbelieve Officer Carter's account of the events. Exhibit 4 at 21:2-11 and 73:12-20.

Officers Carter and Boone arrested Plaintiff (Exhibit 1 at 50:6-8), and Plaintiff did not cooperate with the arrest. Exhibit 1 at 43: 14-18 and Exhibit 4 at 26:6-11. Officer Boone states that the officers were trying to be gentle in arresting Plaintiff. Exhibit 4 at 27:9-14. Plaintiff has provided no evidence that her arrest by the officers was outrageous or that the officers used excessive force in making the arrest.

Plaintiff testified at her deposition that the officers informed her that she was being arrested because she had put paper into the parking meter. Exhibit 3 Deposition of Nefretiti Makenta at 40:19-22. Plaintiff denied putting paper into the parking meter, and stated that the arresting officers were mistaken in believing that she had done so. Exhibit 3 at 40:7-15. Plaintiff has presented no evidence and no testimony that Officers Carter or Boone, or the ACS employees intentionally arrested her based on information that they knew to be false. Exhibit 3 at 41:5-11.

Plaintiff has filed a lawsuit against Officers Carter and Boone, the District of Columbia[1], and ACS in which she alleges false arrest, false imprisonment, intentional infliction of emotional distress, defamation per se (against ACS only), false light (against ACS only), and deprivation of

---

[1] The District of Columbia, Officer Carter and Officer Boone have filed a motion for summary judgment in this matter. To the extent allowed by the Rules of this Court, ACS adopts and incorporates the arguments of that motion into the instant motion.

3

rights under 42 U.S.C. section 1983. Complaint. ACS submits, for the reasons stated herein, that it is entitled to summary judgment on all the claims filed against it by Plaintiff.

<u>**Argument**</u>

**I.    Standard of Review**

Fed. R. Civ. P. 56( c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. See, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The mere existence of a factual dispute will not preclude a grant of summary judgment. Only factual disputes that may determine the outcome of the lawsuit may effectively preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In opposing a motion for summary judgment, the non-moving party cannot simply rely on conclusory statements or allegations. Greene v. Dalton, 334 U.S. App. D.C. 92, 164 F. 3d 671, 675 (D.C. Cir. 1999). Rather the non-moving party must come forward with specific facts which, when viewed in the context of the record as a whole, could lead a rational jury to find for that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

**II.    False Imprisonment and False Arrest**

Plaintiff alleges that she was unlawfully and without legal justification detained by ACS, and has filed a claim for false arrest and a claim for false imprisonment against ACS.

4

A cause of action for false arrest or false imprisonment requires an unlawful detention. See, <u>Smith v. District of Columbia</u>, 399 A.2d 213, 218 (D.C. 1979). In the District of Columbia, there is no practical difference between false arrest and false imprisonment. <u>Lyles v. Micenko</u>, 468 F. Supp. 2d 68, 74, n.7 (D.D.C. 2006); <u>Shaw v. May Dep't. Stores Co.</u>, 268 A.2d 607, 609, n.2 (D.C. 1970).

Here, Officer Carter arrested Plaintiff because he had probable cause for his arrest of Plaintiff. That probable cause was based on (1) his observation of Plaintiff approaching a parking meter that Officer Carter and ACS employees previously had inspected, and found to be empty and in good working order (Exhibit 1 at 40:14-17 and 39:1-2); (2) his observation of Plaintiff placing something in the parking meter ( Exhibit 1 at 36:17-19 and 37:1-10); (3) his observation of the parking meter showing "fail" as Plaintiff left the parking meter (Exhibit 1 at 38:10-12); (4) his observation of a piece of paper in the parking meter (Exhibit 1 at 38:13-17); and (5) the confirmatory observations of Mr. Gamble (Exhibit 1 at 51:7-16). A false arrest claim may be defeated when an officer shows that he had probable cause to make an arrest. <u>Robinson v. District of Columbia</u>, 2006 U.S. Dist. LEXIS 68122, p. 31-32 (D.D.C. 2006); <u>Koroma v. United States</u>, 628 F. Supp. 949, 952 (D.D.C. 1986).

Plaintiff was arrested by Officer Carter who had probable cause to arrest Plaintiff for destruction of public property. Exhibit 1 at 11:2-6. Officer Carter based his decision to arrest Plaintiff on his personal observations as well as the statements made to him by Mr. Gamble. Exhibit 1 at 49:18-22 , at 50:1-13, and 37:14-18. The observations of Officer Carter alone provided a reasonable basis for the arrest of Plaintiff. The record in this matter demonstrates that Officer Carter had both probable cause and a reasonable basis to arrest Plaintiff for destruction of

5

public property so as to defeat Plaintiff's claims of false arrest and/or false imprisonment.

Nowhere in the record of this matter is there any evidence that Plaintiff was arrested or imprisoned by ACS (or any of its employees). Exhibit 2 at 101:1-22 and 102:1. The record in this matter makes clear beyond argument that Plaintiff was arrested by members of the Metropolitan Police Department, (Exhibit 1 at 37: 14-18; Exhibit 3 at 28: 8-22 and 41:4-15; Exhibit 4 at 26:6-17 and 29:3-11) and that the decision to arrest Plaintiff was made by officers of the Metropolitan Police Department based, at least in part, on their personal observations of Plaintiff's conduct. Exhibit 1 at 49:18-22 and 50:1-13.

The record in this matter makes it clear that Officer Carter had both probable cause and a reasonable basis for arresting Plaintiff for destruction of public property. The existence of probable cause and/or a reasonable basis for the arrest are fatal to Plaintiff's claims of false imprisonment and false arrest on April 12, 2005, and they both fail as a matter of law.

Moreover, ACS was not the cause of Plaintiff's arrest, or detention  Plaintiff has provided absolutely no evidence in the record of this matter that establishes that ACS arrested or detained Plaintiff on or about April 12, 2005. Because Plaintiff's arrest by Officers Carter and Boone was based on probable cause or a reasonable basis, and because the record in this matter cannot establish that ACS arrested or detained Plaintiff, the claim of false imprisonment or false arrest against ACS must fail as a matter of law.

III.    **Intentional Infliction of Emotional Distress**

Plaintiff alleges that she suffered emotional distress when she was arrested for a crime of which she was falsely accused of committing.

In order for Plaintiff to recover on a claim of intentional infliction of emotional distress, she must show that ACS engaged in extreme and outrageous conduct that intentionally or recklessly caused her severe emotional distress. Jackson v. District of Columbia, 412 A.2d 948, 956-57 (D.C. 1980). As noted above, there is no evidence in the record of this matter that ACS arrested or detained Plaintiff. With respect to arrest by police officers, a claim for intentional infliction of emotional distress is successfully made out where a police officer is shown to have made a lawful arrest but to have used excessive force, or where an egregiously unlawful arrest has been made. See Kinberg v. District of Columbia, 1998 U.S. Dist. LEXIS, 339, 46-47 (D.D.C. 1998).

As discussed above, the arrest of Plaintiff was based on probable cause, and that probable cause determination by Officer Carter was wholly reasonable. Plaintiff has provided no evidence (nor could she) that the conduct of Officers Carter or Boone, or the ACS employees involved in this incident rose to the level of outrageousness (i.e. so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized society, Smith v. District of Columbia, 882 A.2d 778, 794 (D.C. 2005)) that is required to establish a successful claim of intentional infliction of emotional distress. Nothing in the complaint, or in the deposition testimony of Plaintiff even comes close to demonstrating that the conduct of Officers Carter or Boone, or the ACS employees meets the standard of outrageousness that is required by District law.

There is an utter lack of evidence in the record of this case that would allow Plaintiff to prevail on a claim for intentional infliction of emotional distress against ACS. Plaintiff has completely failed to demonstrate that the conduct of the ACS employees was even unreasonable

7

let alone extreme and outrageous as is required to make out a successful claim of intentional infliction of emotional distress. Based on the lack of evidence in this record, the intentional infliction of emotional distress claim against ACS must fail as a matter of law.

## IV.    **Defamation Per Se**

Plaintiff alleges that she was damaged by the allegedly false statements made by ACS employees about Plaintiff's criminality because the statements were defamatory per se and lowered Plaintiff's standing and reputation in the community.

Plaintiff argues that the statements of the ACS employees to Officer Carter were defamatory per se because they impute criminal activity. Complaint at ¶ 34. Defamation per se is recognized in the District of Columbia as an exception to the general rule that defamation is not actionable unless actual damages are demonstrated. See Grossman v. Goemans, 631 F. Supp. 972 (D.D.C. 1986). A defamation per se claim is therefore actionable even absent a showing of actual damages. This exception has traditionally been restricted by courts to imputation of crimes with severe consequences, such as crimes leading to social ostracism. Washburn v. Lavoie, 357 F. Supp. 2d 210, 214 (D.D.C. 2004) citing Dan B. Dobbs et al., Prosser and Keeton on Torts 788-89 (1984).

In this matter, the proper inquiry is whether the statements attributed to the ACS employees are something from which the commission of a crime of moral turpitude can be inferred. Farnum v. Colbert, 293 A.2d 279, 281 (D.C. 1972).[2] Plaintiff's allegation of defamation per se fails as a matter of law because the statements attributed to the ACS

---

[2] Turpitude is an "inherent baseness or vileness of principle words, or actions; shameful wickedness; depravity." Webster's Third New International Dictionary 2469 (3d ed. 1981).

8

employees do not impute to Plaintiff the commission of a crime of moral turpitude, i.e. a crime of shameful wickedness or depravity.    The crime for which Plaintiff was charged was a misdemeanor count of destruction of public property. This is not a crime of moral turpitude. See In re Sims, 861 A.2d 1 (D.C. 2004). Plaintiff's claim of defamation per se must fail as a matter of law.

While Plaintiff's claim of defamation per se might obviate the requirement that Plaintiff show actual damages, a claim of defamation still requires that Plaintiff establish that ACS made a false and defamatory statement concerning Plaintiff; that injured Plaintiff in her trade, profession, community standing, or lower her in the estimation of the community; that ACS published the statement without privilege to a third party; that ACS's fault in publishing the statement amounts to at least negligence; and that the statement was either actionable as a matter of law irrespective of special harm or that its publication caused Plaintiff special harm. Klayman v. Segal, 783 A2d 607, 613 n.4 (D.C. 2001). Plaintiff has not (and cannot) establish that she has met the burden of establishing all four of those elements in this matter.

Initially, Plaintiff has failed to demonstrate that an ACS employee made any false statement concerning Plaintiff. The record in this matter establishes that Mr. Gamble signaled Officer Carter (Exhibit 2 at 71:8) and that if he said anything he said "I got one". Exhibit 2 at 71:10-11. This statement by Mr. Gamble is simply not a false or defamatory statement concerning Plaintiff as is required by law. Plaintiff has failed to allege in her complaint, or to establish otherwise that ACS (or any of its employees) made a false or defamatory statement concerning Plaintiff.

9

Secondly, a defamatory statement must injure Plaintiff in her trade, profession, community standing, or lower her in the estimation of the community. Plaintiff has made no such showing in this matter that any of the statement of Mr. Gamble has injured her in her trade or profession (Exhibit 3 at 42:12-19 and 43:1-7), or that her standing in the community has been lowered as a consequence of any statement made by Mr Gamble or any other ACS employee. An allegedly defamatory statement must be more than unpleasant or offensive, the language must make the plaintiff appear odious, infamous, or ridiculous. Howard v. Best, 484 A.2d 958, 988-89 (D.C. 1984). Plaintiff has failed to meet that standard.

Thirdly, Plaintiff has failed to offer any evidence that the allegedly defamatory statement was not made without privilege. In the District of Columbia, a qualified privilege exists when a statement about suspected wrongdoing is made in good faith to law enforcement authorities. See, e.g. Curry v. Giant Food Co., 522 A.2d 1283, 1294-1295 (D.C. 1987) and Mosrie v. Trussell, 467 A. 2d 475, 477 (D.C. 1983). Nothing in the record of this matter establishes that any ACS employee made any statement about Plaintiff in other than good faith. Nothing in the record of this matter establishes that any ACS employee made any statement about Plaintiff to anyone other than law enforcement authorities, i.e. Officers Carter and Boone.

Finally, Plaintiff has failed to establish that there was the necessary publication of the any statement with defamatory meaning by ACS employees as is required by law. Lyles v. Micenko, 404 F. Supp. 2d 182, 188 (D.D.C. 2005).

Plaintiff has wholly failed, as a matter of law, to meet her burden of establishing the required elements of either a defamation per se claim, or a defamation claim.

10

## V.    **False Light**

Plaintiff alleges that she was damaged by ACS's depiction of her in a false light as a criminal.

A claim of false light publicity requires that Plaintiff show (1) publicity; (2) about a false statement, representation, or imputation: (3) understood to be out of and concerning Plaintiff; and (4) which places Plaintiff in a false light that would be highly offensive to a reasonable person. Klayman, 783 A.2d at 613-14.

Publicity means that the matter is made public by communicating it to the public at large, or to so many persons that the matter must be substantially certain to become one of public knowledge. See RESTATEMENT (SECOND) TORTS, section 652D, cmt. a, and Steinbach v. Cutler, 463 F. Supp. 2d 1 (D.D.C. 2006). Plaintiff has not demonstrated (and cannot demonstrate) that ACS has communicated any false statements about Plaintiff to the public at large. Plaintiff has not alleged, or established any statement actually made by ACS or its employees that is false, or which places Plaintiff in a false light. As noted earlier, the record in this matter establishes that Mr. Gamble signaled Officer Carter, and that Mr. Gamble may have said "I got one.". Neither the signal, nor Mr. Gamble's statement can be characterized as being communicated to the public at large as is required by law. See, Smith v. District of Columbia, 397 A.2d 213, 221 (D.C. 1979).

Additionally, Plaintiff has not demonstrated (and cannot demonstrate) that ACS has communicated any false statement about Plaintiff which places her in a false light that would be highly offensive to a reasonable person. Mr. Gamble's statement did not make Plaintiff appear odious, infamous, or ridiculous. As such, any statements made by ACS employees could not

11

place Plaintiff in a highly offensive light as a matter of law.

## VI.    Deprivation of Civil Rights (42 U.S.C. section 1983)

Plaintiff alleges that she suffered damages as a result of the District and ACS acting in

concert to violate her rights under the Fourth Amendment to the U.S. Constitution.

Plaintiff argues that the allegedly false arrest and false imprisonment undertaken by

Officers Carter and Boone constitute the violation of her rights under the Fourth Amendment,

and consequently a violation of 42 U.S.C. section 1983.

Government officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982).  This qualified immunity defense applies to police officers for claims of

liability under 42 U.S.C. section 1983.  Anderson v. Creighton, 483 U.S. 635, 638-41 (1987);

District of Columbia v. Evans, 644 A.2d 1008, 1014 (D.C. 1994).

Inasmuch as Plaintiff has alleged a violation of her rights under the Fourth Amendment,

the appropriate inquiry is whether a reasonable officer could have believed [the officer's action]

to be lawful, in light of the clearly established law and the information that the officer possessed.

Anderson, 483 at 641.  Here, the officers' conduct was lawful because Officer Carter had

probable cause to arrest Plaintiff for destruction of public property.  As noted above, probable

cause for an arrest exists, if at the time of the arrest the facts and circumstances within the

officer's knowledge and of which he had reasonably trustworthy information were sufficient to

warrant a prudent man in believing that a crime was committed.  See, Beck v. Ohio, 379 U.S. 89,

91 (1964).

The record in this matter establishes that at the time that Officer Carter decided to arrest Plaintiff for destruction of property, Officer Carter knew that (1) the ACS employees had inspected the parking meters prior to the beginning of the surveillance operation (Exhibit 1 at 40:14-17); (2) the ACS employees had found that each of the parking meters where in proper working order with nothing in the coin slot of each parking meter (Exhibit 1 at 40:14-17); (3) he had visually confirmed the observations of the ACS employees for each parking meter; (4) he and Mr. Gamble had observed Plaintiff approach the parking meter which had not been used by anyone else that day (Exhibit 1 at 39:1-2); (5) he and Mr. Gamble had observed Plaintiff approach the parking meter and put something into the parking meter coin slot (Exhibit 1 at 36:17-19 and 37:1-10); (6) as Plaintiff walked away from the parking meter, the parking meter flashed fail which it had not done before Plaintiff put something into the parking meter coin slot (Exhibit 1 at 38:10-12); (7) immediately after Plaintiff left the parking meter, Mr. Gamble approached the parking meter and observed a piece of paper in the coin slot (Exhibit 2 at 71:1-7); (8) Mr. Gamble had pointed out the piece of paper in the coin slot of the parking meter to him ((Exhibit 2 at 74:19-22); and (9) he had personally observed the piece of paper in the coin slot of the parking meter.

Those facts known to Officer Carter gave him probable cause to arrest Plaintiff for destruction of public property, and Officer Carter is thereby protected by qualified immunity from liability under 42 U.S.C. section 1983. Even if Officer Carter did not have probable cause to arrest Plaintiff, he would be entitled to the protection of qualified immunity because his decision to arrest Plaintiff was reasonable. See Hunter v. Bryant, 502 U.S. 224 (1991).

13

Plaintiff's claim for violation of 42 U.S. C. section 1983 against the government of the District of Columbia, similarly, must fail. A municipality can only be found liable under 42 U.S.C. section 1983 where the municipality itself causes the constitutional violation at issue. Monell v. Dep't. of Social Services of the City of New York, 436 U.S. 658, 694 (1978). In order for Plaintiff to prevail on her claim against the government of the District of Columbia, Plaintiff must demonstrate that a official custom or policy of the District government causes a deprivation of constitutional right. See Carter v. District of Columbia, 795 F.2d 116, 122 (D.C. 1986). The record in this matter fails to establish any evidence that any District government practice, custom, or policy was the cause of the alleged deprivation of a constitutional right, or that there was any constitutional deprivation suffered by Plaintiff. Plaintiff makes only the most bare allegation that the District government was indifferent. Plaintiff's burden in supporting her claim requires, however, that she present concentrated, fully packed, and precisely delineated scenarios demonstrating the existence of a pattern or policy that deprived Plaintiff of a constitutional right. See Carter, 795 F.2d at 125.

Plaintiff's theory of liability for ACS under 42 U.S.C. section 1983 is unclear, but would appear to be premised on a vicarious liability or respondeat superior theory. Neither theory creates liability for ACS under 42 U.S.C. section 1983. See City of Canton v. Harris, 489 U.S. 378 (1989).

14

## Conclusion

WHEREFORE, for the foregoing reasons defendant ACS respectfully requests that this Court grant its motion for summary judgment and dismiss each and every claim of the above-captioned matter with prejudice; and/or such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Frederick D. Cooke, Jr.

_____

Frederick D. Cooke, Jr., D.C. Bar No. 164608
Rubin, Winston, Diercks, Harris & Cooke, LLP
1155 Connecticut Avenue, NW, Suite 600
Washington, D.C. 20036
202 861 0870
202 429 0657 (facsimile)

Counsel for
ACS Government Systems, Inc.

15

**EXHIBIT 1**
**DEPOSITION TRANSCRIPT EXCERPTS**
**OFFICER DAVID CARTER**

1    people employed by ACS.   I'm not sure - I can't

2    remember everybody that was involved in the actual -

3    it was a few people there.

4        Q    And what was the discussion in those

5    meetings?

6        A    Discussions in the meetings were about

7    problems with people tampering with parking meters.

8    They're constantly having to go out and fix them.

9    There's quite a few parking meters that were

10   damaged.

11       Q    As of April 12th, 2005, where were you

12   assigned?

13       A    I was assigned to the Second District,

14   Focus Mission Unit.

15       Q    And what was your actual job at that

16   time?

17       A    Focus Mission Unit, we encompass -

18   we do vice investigations, we do theft

19   investigations, we do robbery, different offenses.

20       Q    How is it that you came to be at the

21   area of 21st and H on the day of the incident?

22       A    That was an area that was chosen

1      because of a high area, or a high volume of problems

2      with parking meters being tampered with.

3              Q      How did you know that?

4              A      This information came to us through

5      ACS.

6              Q      Who at ACS provided it?

7              A      Aaron Gamble.

8              Q      And was Aaron Gamble in attendance at

9      the meetings, the ACS meetings?

10             A      Yes, yes.

11             Q      Where were those meetings held?

12             A      We had them at the Second District.

13             Q      Now, do you have any actual training in

14     meters, parking meters?

15             A      No.   I don't have any formal training,

16     no.

17             Q      Any certifications?

18             A      No.

19             Q      Do you know if Mr. Aaron does?

20             A      Yes, I believe he does.

21             Q      And the meter at issue, was it an

22     electronic meter?

1          BY MR. TEMPLE:

2          Q      And in this particular case, in

3     determining probable cause, would you have relied

4     upon   Mr.   Aaron   for   that   purpose,   or   your   own

5     observations?

6          A      Both.

7          Q      And had you arrested anyone in

8     conjunction with Mr. Aaron prior to April 12th?

9          A      Yes.

10          Q      Approximately how many people?

11          MR.   BRUCKHEIM:   Same   objection   as   to

12     relevance.   He can answer.

13          THE   WITNESS:   I   don't   know.    I   mean,   I

14     haven't had a chance to review and like I said, it

15     was awhile ago.

16          MR.   TEMPLE:   Now   on   that   particular   day,

17     what shift were you working?

18          THE   WITNESS:   I   believe   we   were   working

19     like the day-work shift.

20          BY MR. TEMPLE:

21          Q      Start time?

22          A      I think we were coming pretty early.

1        A    Correct.  Because those were the only

2    ones we were observing at the time.

3        Q    And when you say you checked them out,

4    can you tell me what that consisted of?

5        A    The guys from ACS go around, and they

6    physically open up the meters, make sure there's no

7    foreign  objects  in  them,  make  sure  that  they're

8    working properly.

9        Q    Did they make any notations or

10   documentation of those tests?

11       A    Not that I'm aware of, no.

12       Q    So there would be no record as to the

13   time  that  they  actually  checked  these  various

14   meters?

15       A    Not that I'm aware of.

16       Q    Did they also monitor, from the point

17   that they tested the meters, whether people actually

18   parked at those meters, after they tested them?

19       A    Yes, we sat there the entire time, from

20   the time we checked the meters until we left.

21       Q    Okay, what time did you leave?

22       A    After we made the arrest.

1          THE WITNESS: Not that I'm aware of.

2          BY MR. TEMPLE:

3      Q     Okay, and neither did you or your

4   partner?

5      A     No.

6      Q     Now, can you tell me what you observed

7   from this point, that you first saw Ms. Makenta park

8   her vehicle?  Did you see her park her vehicle?  Let

9   me ask you that.

10     A     Did I see her park her vehicle?  As I

11  said, I'm sure I did, but I don't have any personal

12  recollection of that right now.

13     Q     Okay, when do you remember first seeing

14  her?

15     A     I remember first seeing her at the

16  meter.

17     Q     At the meter?

18     A     Yes.

19     Q     Okay.  And you - tell me what you

20  recall seeing.

21     A     Just seeing her placing objects into

22  the meter.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q     So all you saw was her interacting with

2     the meter?

3          A     Correct.

4          Q     And so what else did you observe after

5     she was - or as she was putting these objects into

6     the meter?

7          A     After she put the objects into the

8     mater - the meter flashes red when it goes onto

9     fail.

10         Q     And you saw the fail sign?

11         A     Yes, I could see it from where I was

12    sitting.

13         Q     And then what happened?

14         A     It was either Aaron or Paul, were

15    there.   Once she left the meter, they opened the

16    meter up and were able to retrieve the object that

17    was just placed into the meter.

18         Q     And help me understand a couple things

19    here.   What did they retrieve from the meter?

20         A     They retrieved a quarter and a piece of

21    paper.  A folded up piece of paper.

22         Q     Okay, did they give that to you?

1       Q      Did you ask her any questions on the

2   scene, after she was detained?

3       A      No.

4       Q      When she asked why she was being

5   arrested, what was she told?

6       A      She was told that she was being

7   arrested for tampering with the parking meter.

8       Q      And how did she learn that there was

9   paper in the meter?

10       A      We told her.

11       Q      Did you all show her?

12       A      I don't think so, I mean, but we may

13   have.  I just don't recall.

14       Q      Did you know that three coins were

15   retrieved from the meter?

16       A      It's possible there could have been.

17       Q      When you saw her put objects in the

18   meter, could you see her hand movement?

19       A      Yes.

20       Q      Okay.  And did you see repeated hand

21   movement, repeatedly putting coins in the meter?

22       A      I don't recall that.

1        Q      Did it ever appear to you that she was

2    trying  to  stick  something  in  the  meter,  versus

3    depositing something in the meter, depositing a coin

4    in the meter?

5        A      Yes.

6        Q      And you saw that?

7        A      I said it appeared that way.  At that

8    point, when we see things that we may think - we

9    take a closer look, and that's why one of us gets

10   out of the vehicle to go look.

11       Q      What was the visibility at that

12   particular point in time, in terms of lighting?

13       A      It was bright daylight.

14       Q      You made the decision to arrest her?

15       A      Yes.

16       Q      And your decision was based not on your

17   observation, but on Mr. Aaron's observation?

18       A      Partly both.

19       Q      You didn't see her put paper in the

20   meter?

21       A      No, I saw her putting objects in the

22   meter, I just didn't know what was actually being

1    put into the meter.

2         Q    And you saw the fail sign appear on

3    the meter?

4         A    Correct.

5         Q    But your basis for determining to

6    arrest her was based upon the fact that the fail

7    sign came up and when you went to the meter, well,

8    let me ask you that.  When the fail sign came up,

9    what did you do at the meter?

10        A    After she left the meter, they opened

11   it up and were able to retrieve the items out of the

12   meter.

13        Q    And based upon the failed meter and

14   then opening the meter and retrieving the paper, you

15   concluded that she had put the paper in the meter?

16        A    Correct, and that Aaron Gamble was

17   there also and observed.  All with that surrounding.

18        Q    How would you know that someone else

19   didn't put the paper in the meter before her?

20        A    How would I know?

21             MR.  BRUCKHEIM:  Objection.    You   can

22   answer.

1       Q       Was it white paper?

2       A       I don't know.

3       Q       Was it thick or thin?

4       A       I don't really recall.

5       Q       When they took it out of the meter, did

6   they - who took it out of the meter?

7       A       Aaron Gamble.

8       Q       And what did he do at the point that he

9   took it out of the meter?

10      A       He took it out.

11      Q       Did he show it to you?

12      A       Yes, we all looked and saw it exactly

13  what it was.

14      Q       Okay, and then - and you do recall

15  specifically checking that meter on that day?

16      A       Yes.  We checked all the ones in that

17  particular area.

18      Q       But no log was made of the meters that

19  were checked?

20      A       Not that I'm aware of.

21      Q       Let me show you - I guess this is your

22  PD81 - property record. Where it says "the paper,"

1    stand out in my mind, and when I put them in

2    quotation marks, I put them in there because that's

3    exactly what a particular person - that's what they

4    say, and that's what I remember.

5        Q    Well when did she say that?

6        A    She said it on the scene, when

7    we were placing her under arrest.

8        Q    Did she say anything else?

9        A    She said a lot.

10       Q    What else did she say?

11       A    I don't remember verbatim, everything

12   else that she said.

13       Q    What does that mean, verbatim?

14       A    I just remember she was really upset

15   and she was screaming, she was yelling, she was

16   saying that we weren't police.  She was saying she

17   doesn't understand why she's being placed under

18   arrest.  It was things to that fact.

19       Q    Did she use any profanity?

20       A    Yes.  I believe.

21       Q    What did she say to you?

22       A    She was just screaming.  I shouldn't

1      Mr. Gamble's observation?

2           A     No.

3           Q     From where you were sitting, what was

4      your impression of Mr. Gamble's view of the parking

5      meter?

6           A     That he had a totally unobstructed

7      view and he was able to actually see, get definitely

8      a better shot of what she was doing, what she put in

9      the meter.

10          Q     You had testified that you actually,

11     with Mr. Gamble there, inspected the meter, opened

12     it up and found the objects inside.

13          A     Yes.

14          Q     You also testified that Mr. Gamble

15     told you that he saw Ms. Makenta insert the piece of

16     paper into the meter.

17          A     Yes.

18          Q     Those are two foundational questions

19     for this next question.   When Mr. Gamble told you

20     about his observation of Ms. Makenta inserting the

21     paper into the meter, did he tell you that before

22     you opened the meter up, or after you opened the

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

50

1    meter up?

2         A    He told me before.

3         Q    Okay.  And after the meter was opened,

4    the paper was discovered?

5         A    Yes.

6         Q    Okay.  At that point, was that when

7    you made the decision to place Ms. Makenta under

8    arrest?

9         A    Yes.

10        Q    How long did you wait outside before M

11   Ms. Makenta re-emerged from the building?

12        A    It was brief.  Ten, fifteen minutes,

13   maybe.

14        Q    And what was Ms. Makenta charged with?

15        A    Destruction of government property.

16        Q    Okay.  Is that a misdemeanor or a

17   felony?

18        A    That would be a felony.

19        Q    Have you made arrests for felony

20   destruction of property prior to arresting Ms.

21   Makenta?

22        A    Yes.

1        Q    Okay.  As to your knowledge of -

2   did you have any knowledge as to why destruction of

3   property in this case would constitute a felony as

4   opposed to a misdemeanor?

5        A    It's government property, and it's -

6   the cost is greater than $200.

7        Q    Based on your observations and Mr.

8   Gamble's  observations,  did  you  have  reason  to

9   believe that Ms. Makenta had committed that crime?

10       A    Yes.

11       Q    Did you have any reason to doubt that

12  she had committed that crime?

13       A    No.

14       Q    And did you act in accordance with your

15  belief?

16       A    Yes.

17       Q    I don't have anymore questions.

18            MR.  TEMPLE:  Was  that  meter  actually

19  destroyed,

20  by that paper being put into it?

21            THE  WITNESS: It was rendered inoperable,

22  which    could    be    broken,    which    falls    under

1          Q      And the piece of paper that was taken

2     out of that meter, as it was folded, can you draw

3     that piece of paper, in terms of the size of it?

4          A      I don't know.

5          Q      Okay.  So you don't have any

6     recollection of that?

7          A      No.

8          Q      No further questions, thank you.

9               MR. BRUCKHEIM: I just have a couple of

10    followup.   Investigator Carter, can you describe

11    very   briefly   the   purpose   of   this   particular

12    operation that you were on?

13              THE WITNESS: The purpose of it - we had

14    discussed   that   there   were   large   areas   in   the

15    District where meters are being tampered with, and

16    quite a few, a large number of them, were being put

17    on fail, which means that they cannot accept money.

18     Which means that they have to send a repair person

19    out there to have the meter repaired.   And this is

20    apparent that this has been intentional.   So they

21    had us go — well, ACS would identify the area where

22    the largest problems would be, and that's where we

1    would go and set up surveillance.

2              RECROSS EXAMINATION

3              BY MR. BRUCKHEIM:

4         Q    Was the concern about working meters

5    being rendered into non-working meters?

6         A    Yes.

7         Q    Okay.  And the purpose of this

8    operation was to observe these meters and see if

9    anybody was rendering working meters into non-

10   working meters?

11        A    That's correct.

12        Q    How important was it to the operation

13   to ensure that every meter was in working order

14   before you began the operation?

15        A    It was very important.

16        Q    Why?

17        A    Because we wanted to make sure that

18   we gave everyone the benefit of the doubt as far as

19   the meters working.  And we did not want anybody to

20   go up to a meter that was not working, place objects

21   in the meter, it's not working - so we wanted to

22   make sure that every meter was working to prevent

1    from arresting innocent people.

2        Q    After all the meters were checked, and

3    before you began the observation part of this

4    operation, did you have any reason to doubt that any

5    of the meters were in working order?

6        A    No.

7        Q    Okay.  So to your knowledge and

8    understanding, every meter was in working order?

9        A    That is correct.

10       Q    Are you familiar with the process of

11   papering?

12       A    Yes.

13       Q    What is that process?

14       A    That process is when we go before the

15   prosecuting attorney and present the case.    We

16   present to the prosecuting attorney, they make a

17   decision as to whether they're going to go forward

18   with the case or whether or not they're not going to

19   go forward with the case.

20       Q    Let me just ask, did you paper this

21   case?

22       A    Yes.

**EXHIBIT 2**
**DEPOSITION TRANSCRIPT EXCERPTS**
**AARON GAMBLE**

45

1        Q      And then at what point does

2   Officer Carter come in?

3        A      Carter maybe arrived in 15

4   minutes, 20 minutes after that.

5        Q      So, between 6:15 and 6:20?

6        A      20 I would say.

7        Q      And what happens -- between 6:00

8   and 6:20, what did you and Paul do?

9        A      We started checking the meters

10   along with Detective Carter.

11        Q      And when Officer Carter comes,

12   what does he do?

13        A      The same, checking.  Once we

14   arrived on the scene, we waited for Detective

15   Carter to pull up.  At that point in time, we

16   started checking the meters along with

17   Detective Carter.

18        Q      Okay.  Now, you say "we started

19   checking".  Did you -- how did you all check

20   them?  I mean, there's you, Paul and Carter on

21   the scene.  What did you all do?

22        A      Open the meters up, look inside of

1    them, look in the coin tracks.  Basically,

2    you're just inspecting the coin tracks and

3    make sure that they're working properly.

4          Q     Did the three of you all do that

5    together or did you all split up?

6          A     I believe we split up but I'm not

7    really sure.

8          Q     Okay, and how do you all usually

9    do it?  You and Paul together, how was your

10   usual system for doing this?

11         A     If we're doing a sting operation?

12         Q     Yes, sir.  This is a sting here.

13   This is a sting?

14         A     Oh, okay.   Yes.

15         Q     Okay.  So what is you all's system

16   for checking the --

17         A     Well, there's nothing actually

18   wrong when I say sting, so I want to get that

19   clear.

20         Q     It is what it is.

21         A     All right.  Say that again, I'm

22   sorry.

47

1          Q      What is you all's system, you and

2     Paul, when you all split up the meters?  Do

3     you take this half block, I take this half or

4     you do it together?  What do you do?

5          A      It depends on our staff but that

6     particular day, I believe we might have walked

7     all of them together but I'm not really sure.

8     I can't really say.  I don't know.  I can't

9     remember.  I don't recall.

10         Q      Okay.  Other than -- what time did

11    you leave the scene that morning?

12         A      Leave the scene?  I don't know

13    what time we left.  You're talking about after

14    the arrest?

15         Q      After Ms. Makenta's arrest, you

16    made another arrest.

17         A      We made another arrest.

18         Q      Okay, between the time that you

19    arrived on the scene and the time of Ms.

20    Makenta's arrest, did you make any calls on

21    your cell phone?

22         A      I don't know, it was two years

1    ago.

2         Q    Okay.  Is it possible?

3              MR. COOKE:  Objection.  You can

4    answer.

5              THE WITNESS:  Huh?

6              MR. COOKE:  You can answer.

7              THE WITNESS:  Oh, I'm sure it is.

8    I don't know.

9              BY MR. TEMPLE:

10        Q    Now, after you all checked the

11   meters, sir, Officer Carter arrives at 6:20

12   and you say it takes only around 30 minutes to

13   check the meters.  So --

14             MR. COOKE:  Objection to the form

15   of the question.

16             BY MR. TEMPLE:

17        Q    You say it takes 30 minutes or so

18   to check those meters?

19        A    I'm guessing.

20        Q    You're guessing.  After you all

21   check the meters, you finished checking them,

22   let me strike that question.

1              You don't recall whether Mr. Aaron

2    (sic) was with you when --

3         A    I'm Aaron.

4         Q    I keep -- I'm sorry, Mr. --

5         A    Hudson.

6         Q    -- Hudson, Hudson was with you

7    when you checked the meters or whether he

8    checked them  separately; is that right?

9         A    Yes.

10        Q    You do recall at that point after

11   the meters were checked that you all did

12   something?

13        A    Yes.

14        Q    Do you know what you all did?

15        A    You said after the meters were

16   checked?

17        Q    Yes.

18        A    After the meters were checked and

19   Dave looked at all the meters they were

20   working properly at that point in time, we

21   just sat in the vehicle.

22        Q    You said when Dave looked at the

1   meters?

2        A      Carter, Officer Carter.  We all

3   checked -- once -- the process is that whether

4   we checked the vehicles (sic), I can't

5   remember as I stated before, I don't remember

6   how the meters were checked.  I know that

7   Carter would not allow us to do an operation

8   unless he inspects the meters.  So if Paul

9   says he checks those meters, and he leaves

10  them open for Carter to come behind him and

11  look inside of them, that could have happened.

12  I don't recall how we did everything that day.

13       Q      What does Carter do when he

14  actually does his thing, which is when he

15  checks them?  What does he do?

16       A      What we're doing is visually

17  inspecting, making sure that there's no

18  objects,  nothing inside of the meter.

19       Q      So you're -- so there's a joint

20  inspection then.  You're saying you actually

21  inspect the meter.  Then Carter comes along

22  and he also conducts an inspection?

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433            WASHINGTON, D.C. 20005-3701            www.nealrgross.com

1       A     Yes.

2       Q     Does he actually pull a canister

3    out of the thing out and --

4       A     There's no need to pull a canister

5    out.

6       Q     So he actually looks at it and

7    then he closes it up?

8       A     He doesn't close it up.

9       Q     He looks at it.  So there's a two-

10   part thing.  You open it, you look at it,

11   Carter looks at and then you close it.

12      A     I close it.  Myself or Paul could

13   have closed it.  I'm not sure who would have

14   closed it.

15      Q     Were you wearing sunglasses that

16   morning, do you recall?

17      A     I don't recall.

18      Q     Now, whose car did you all sit

19   back in that morning?  You said you all sat

20   in a car after you conducted the inspections.

21      A     I think Paul sat in Dave's car and

22   I sat in the car that we road in.  I think

```
 1        with the -- she actually -- you see her go --

 2        how far is she from the meter when she's doing

 3        this tearing thing?

 4             A    She's right at the meter.

 5             Q    And then you see her put something

 6        in the meter?

 7             A    Yes.

 8             Q    And you don't know what the

 9        something was?

10             A    I don't know what the something

11        is.

12             Q    Okay.  And you say there may have

13        been a second time?

14             A    Yeah.

15             Q    Did you -- what did she do after

16        that?

17             A    After what part?  After she left

18        the meter is that --

19             Q    Yes, sir.

20             A    Is that what you're saying?

21             Q    Well, before -- let me reframe

22        that.  When she does that, what do you see in
```

1          A      At that point in time, she walks

2     away.  I don't recall if she went back to her

3     car, but what I do remember is that she walked

4     across the street toward the library.  At that

5     point in time, I ran to the meter, looked at

6     the meter, saw the word "fail".  You could see

7     the paper inside of the coin track.

8                 I then signaled Kent -- I'm sorry,

9     I keep saying Kent, Detective Carter that I

10    had -- if I said something I probably said, "I

11    got one".

12          Q      Okay, now, the coin track is where

13    the coin goes in the meter, to be clear.

14          A      Yes, uh-huh.

15          Q      Okay, now, so you walk to the

16    meter and you looked at the meter.

17          A      Uh-huh.

18          Q      You see the "fail" sign.

19          A      Yes.

20          Q      And you see paper.

21          A      Uh-huh.

22          Q      Okay, do you not see a quarter in

1   dimes, your nickels in there and they'll push

2   that behind there and it will force it down.

3   There's a censor somewhere in that coin track.

4   I'm not an expert on that, but there's a

5   sensor somewhere along there where it sends it

6   to the brain of the mec that there's something

7   in the coin track that makes it go fail.  So

8   I mean, it depends on how much paper somebody

9   puts in there.  I can't tell you that.  I

10  don't really know.

11              BY MR. TEMPLE:

12       Q    Okay, how long was she in the

13  library?

14       A    It wasn't even that long.  I don't

15  know, it wasn't -- I would say no more than

16  five minutes it seemed like.

17       Q    When you tell Officer Carter, "We

18  got one", what does he do?

19       A    He comes up, he runs up to where

20  I'm standing at.  He looks for himself.  I

21  pointed him, I says, "Look, look at the paper,

22  the meter is on fail".  He's like, "Who".

1    up or down.

2         Q    But that's where -- there's a stop.

3    Do you all go back across the street to the

4    meter at some point?

5         A    At that point in time, Detective

6    Carter identified himself as being a police

7    officer and identified who I was and we told

8    her what transpired and that we wanted -- at

9    that time, she said, "Oh, I just paid the

10   meter, I just paid the meter", and we wanted

11   to show her what she had did.  So at that

12   time, I believe it was Detective Carter

13   suggested that we go across the street to

14   actually show her.  That's where I volunteered

15   to open the meter and show her what happened.

16        Q    So when you opened the meter, what

17   do you -- tell me what happens at that point.

18        A    When I opened the meter, at that

19   point in time I showed her the paper.  I don't

20   recall if I pulled it out or if crime scene

21   came or whatever.  I don't recall that, but I

22   know that I showed her that paper because she

101

1    she can see the paper that was inside of it,

2    but not actually physically removing it from

3    the mechanism.

4         Q    Okay.  Did you on the 12th of April

5    2005, did you arrest Ms. Makenta?

6         A    No.

7         Q    Did Paul Hudson or any other ACS

8    employee arrest Ms. Makenta?

9         A    No.

10        Q    Did you assist in the arrest of Ms.

11   Makenta?

12        A    No.

13        Q    Did Mr. Hudson assist in the arrest

14   of Mr. Makenta?

15        A    No.

16        Q    Did you detain Ms. Makenta?

17        A    No.

18        Q    Did you ask the Metropolitan Police

19   Department to detain Ms. Makenta?

20        A    No.

21        Q    Did you ask the Metropolitan Police

22   Department to arrest Ms. Makenta?

1        A     No.

2        Q     On the morning of April 12th, 2005,

3   after you inspected -- after the meters on

4   that block were inspected, before Ms. Makenta

5   parked at the meter in question, did any other

6   individual park there?

7        A     No one parked at that particular

8   meter.

9        Q     Did any other individual -- did you

10  see any other individual put coins or approach

11  the meter like they were putting coins into

12  the meter?

13       A     No, not that particular meter.

14       Q     Okay, so Ms. Makenta was the first

15  person, to your knowledge, to approach that

16  meter.

17       A     Yes.

18       Q     To use that meter.

19       A     Yes.

20            MR. COOKE:  No further questions of

21  this witness at this time.

22            MR. TEMPLE:  Mike?

**EXHIBIT 3**
**DEPOSITION TRANSCRIPT EXCERPTS**
**PLAINTIFF NEFRETITI MAKENTA**

20

1       Q      Okay.  Do you recall which street you

2    parked it on?

3       A      I don't recall.

4       Q      Okay.  And after you picked up your

5    coffee from the Starbucks, you got back in your

6    car and went to the G.W. Media Center?

7       A      Correct.

8       Q      Okay, and you didn't make any stops --

9       A      No.

10      Q      -- before doing that.  Okay.

11             And I have a copy of the police report

12   and it mentions what type of car you were

13   driving.  It says it was a white Infinity; is

14   that correct?

15      A      Correct.

16      Q      Okay.  Is that your car?

17      A      Correct.  It is.

18      Q      It's registered in your name?

19      A      Un-huh.

20      Q      Do you know if anybody else drives

21   that car other than you?

22      A      Just me.

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVE., N.W.

(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1          Q    Just you, and the tags on that car --

2    again, I'm just reading from the report.  I just

3    want to make sure that's right -- has D.C. tags,

4    and then it says NIAMBI 1, and that's spelled for

5    the court reporter N-I-A-M-B-I 1?

6          A    Yes.

7          Q    Okay, and that was the vehicle you

8    were driving that day?

9          A    Yes, it is.

10         Q    Okay.  Now we can go back to the point

11   when you turned around to walk back out of the

12   G.W. Media Center.  Tell me what happened then

13   when you walked out.

14         A    Well, I started walking out of the

15   library, and there were four men walking toward

16   me.  In the middle of the street they sort of

17   stopped me and said that he said you put paper in

18   the meter or something like that.

19         Q    Can you describe what the men looked

20   like?

21         A    There were four black men of various

22   heights, ununiformed, jeans, sweatshirts and that

1    open the meter in front of me.  He just took his

2    key and just yanked it open, and I was terrified.

3    I mean, there's a quarter there.  Everybody can

4    see there's a quarter there.

5             The guy across the street saw me walk

6    to the hot dog stand, walk back to my car and go

7    to the meter, and put something in the meter, a

8    quarter.  He saw me.  He saw me, and he said to

9    me, he said, "Do you have any witnesses?"  That

10   same guy who was standing across the street, that

11   slim guy, he says, "Do you have any witnesses?"

12            And I was so confused because I said

13   to myself this guy was standing here the entire

14   time.  He's a witness, but yet he asked me do I

15   have any witnesses.  He saw me.

16            I said to him, I said, "You saw me

17   walk to the hot dog stand to get change, and you

18   saw me walk back to my car to the meter."

19       Q    Okay.

20       A    And so I started screaming.  I just

21   started screaming.  I didn't know what these men

22   were going to do to me.

1            The next thing I know one of the guys

2    is taking out handcuffs, and I know there weren't

3    many people ont he street, and I just was trying

4    to get as many people to see (inaudible) because

5    I was scared.

6            Q    Okay.

7            A    I was scared that they were officer

8    and I did ask for them to show me their badges,

9    but nobody would show me their badges.  And I was

10   steady yelling, "Please help me, please help me,

11   somebody please help me.  I put a quarter in the

12   meter.  They said I put paper in the meter.

13   Please help me, somebody," and so I just started

14   screaming for help until enough people could

15   gather on the street so I would have some

16   witnesses to see what was happening to me.

17            MR. TEMPLE:  Do you have tissues?

18            MR. BRUCKHEIM:  I do not.  We can take

19   a moment or two if you want to grab some.  Do you

20   want to go off the record for a few minutes to

21   get some?

22            MR. TEMPLE:  Yes.

1    while you were screaming?

2         A    Not that I can recall right now.

3         Q    Okay.  Did they put the handcuffs on

4    you?

5         A    Well, I made it difficult because,

6    again, I thought that they were going to take me

7    to some place in some back wood something,

8    something, and you know, have their way with me.

9    So honestly, I just was screaming to try to get

10   anyone to witness what happened.

11             And I'm sorry.  What was your

12   question?

13        Q    What was my question?  Ultimately did

14   they handcuff you?

15        A    Ultimately they did handcuff me, yes.

16        Q    Okay.  That's okay.  Let's keep going.

17             You say ultimately they did handcuff

18   you.  Can you recall which of the men did the

19   handcuffing?

20        A    I guess it was the same one that

21   pulled out the handcuffs.

22        Q    Did you see him put the handcuffs on

**EXHIBIT 4**
**DEPOSITION TRANSCRIPT EXCERPTS**
**OFFICER KENNETH BOONE**

 1    already explained to her what they saw her do.

 2         Q      You said you guess.  But you don't

 3    know?

 4         A      No, I wasn't there.

 5         Q      Okay.

 6         A      I can only assume.

 7         Q      So by the time you arrived on the

 8    scene, the communication between Mr. --

 9    Officer Carter and Ms. Makenta had already

10    commenced.

11         A      Yes.

12         Q      Okay.  Let me ask you something.

13    What time did you start work on that

14    particular day?

15         A      I don't recall.  I don't even

16    recall the time that this happened.  I mean,

17    it was a while ago, and I didn't really keep

18    it in my mind.

19         Q      Okay.  I'm going to show you what

20    we've marked as Exhibit 1.  Just giving you

21    that to look at to refresh your recollection

22    as to the time.

28

```
1    there or something.

2         Q      You don't have a copy of that with

3    you?

4         A      Yes.

5         Q      Can I see it, please?  Sir, this

6    particular card, just for the record, is an

7    identification card, and it looks like a hole

8    at the top right above the picture.  And this

9    would have been hanging from your neck on a

10   chain?

11        A      Not a chain but maybe something

12   like a string or something.

13        Q      A string or something?  And other

14   than this being on your neck, did you say,

15   "Ms. Makenta, let me show you my

16   identification, so that I can confirm for you

17   that I'm a police officer"?

18        A      No.

19        Q      And did you -- when she refused to

20   be handcuffed, did you actually participate in

21   her arrest?

22        A      Yes.
```

40

1        Q      On that 23rd Street surveillance,

2    did you observe them actually inspect the

3    meters?

4        A      I don't recall.

5        Q      Okay.  When they would inspect the

6    meters -- you have seen them inspect the

7    meters, is that correct?

8        A      Correct.

9        Q      Would they have any documentation

10   to make a note to confirm that the meter was

11   functioning?

12       A      Not that I saw, no.

13       Q      Did you know that Paul no longer

14   works for ACS?

15       A      Yes.

16       Q      And how did you learn that?

17       A      Well, Mr. Gamble advised me.

18       Q      And when did he tell you that?

19       A      I don't know the month or the -- I

20   believe last year sometime.

21       Q      Did he tell you why he no longer

22   worked with ACS?

41

```
 1        A      I don't recall.  He just -- no, I
 2   don't recall.
 3        Q      Mr. Gamble did not tell you why?
 4        A      I don't recall.
 5        Q      And that conversation, where would
 6   that have occurred?
 7        A      Cell phone.
 8        Q      Is Mr. Gamble a personal friend of
 9   yours?
10        A      Now he is, yes.
11        Q      And so have you all talked about
12   this particular incident involving Ms. Makenta
13   on a personal level?
14        A      Yes.
15        Q      And how many times?
16        A      I don't know.
17        Q      You at some point found out that
18   she was suing --
19        A      Yes.
20        Q      -- ACS?  How did you learn that?
21        A      By Mr. Gamble.
22        Q      And did he call you or tell you
```

42

1    that?

2          A      Yes.

3          Q      And what did he tell you?

4          A      That along with us being sued she

5    is suing ACS also.

6          Q      Did you all discuss the lawsuit?

7          A      No, not -- I mean, we discussed

8    her I guess, yes, suing us, but I didn't

9    really have anything to discuss.

10         Q      Now, you are aware, are you not,

11   that there was a subsequent arrest on that

12   same street before 10:00 that morning?

13                MR. BRUCKHEIM:  Objection as to

14   relevance.  You can answer if you know.

15                THE WITNESS:  Yes.

16                BY MR. TEMPLE:

17         Q      How do you know that?

18                MR. BRUCKHEIM:  Same objection.

19   You can answer.

20                MR. TEMPLE:  Do you want to just

21   raise a continuing objection?

22                MR. BRUCKHEIM:  To the extent that

1    you're going to ask questions on a subsequent

2    arrest, yes, I want to raise a continuing

3    objection.   You can answer the questions.

4              THE WITNESS:   Based on my

5    recollection, I stayed, I believe.

6              BY MR. TEMPLE:

7        Q    So you didn't actually leave the

8    scene after Ms. Makenta was arrested?   You

9    remained on the scene, is that correct?

10       A    Yes, until the scene was clear.

11       Q    When you say "the scene was

12   clear," what do you mean by that?

13       A    Until there was no need for us to

14   be there on the street at all.

15       Q    How long were you all on that

16   street that day?

17       A    I don't know, sir.

18       Q    Sir, you participated in a

19   subsequent surveillance, would that be

20   correct?

21       A    I don't know.  I don't remember

22   that.  I do remember another arrest, but I

1        Q      You can answer.

2        A      No.

3        Q      If you had gotten that impression,

4    what would you have done?

5               MR. TEMPLE:   Objection.

6               BY MR. BRUCKHEIM:

7        Q      You can answer.

8        A      I wouldn't have -- I wouldn't have

9    been a part of it, and I wouldn't let that

10   arrest happen.  I mean, that's my job on both

11   sides, you know.

12       Q      Okay.  Based upon what you

13   observed on the scene, and what you learned

14   upon arriving on the scene, did you reasonably

15   believe that Ms. Makenta had committed a

16   crime?

17       A      Yes.

18       Q      That was your personal reasonable

19   belief?

20       A      Yes, sir.

21              MR. BRUCKHEIM:   I have no further

22   questions.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**NEFRETITI MAKENTA,**      )
)
       Plaintiff,      )
)
                  )     Civil Action No. 06-1093 (JR)
vs.                )
)
**DISTRICT OF COLUMBIA, et al.,**   )
)
       Defendants.    )

## DEFENDANT ACS GOVERNMENT SYSTEMS, INC.
## STATEMENT OF MATERIAL FACTS WHICH ARE NOT IN DISPUTE

Defendant ACS Government Systems, Inc. (hereinafter "ACS"), by and through undersigned counsel, hereby submits the following material facts that are not in dispute:

1.    ACS, in conjunction with Metropolitan Police Officer Carter, was part of a surveillance operation in an area of the District where working parking meters had frequently been rendered into non-working meters.  Exhibit 1, Deposition of David Carter at 57: 10-22 and 58: 1-11; Exhibit 1 at 8:20-22 and 9:1-7.

2.    Prior to the arrest of Plaintiff, the parking meter that she used was in proper working order and did not have a fail sign on it.  Exhibit 1 at 45:13-20.

3.    Officer Carter and ACS employee Aaron Gamble observed Plaintiff putting objects into the meter and then saw the fail sign flash while she was at the meter.  Exhibit 1 at 23:15-22 and 27:4-12.  Exhibit 2, Deposition of Aaron Gamble at 67:4-7 and 71:1-7.

4.    After Plaintiff left the meter, the meter was immediately inspected by Aaron Gamble and a piece of paper was discovered to be in the coin track of the parking meter. Exhibit 1 at 46: 9-15. Exhibit 2 at 71:1-7.

5.    Aaron Gamble pointed out to Officer Carter the piece of paper that he had observed in the coin track of the parking meter that had not been in the parking meter before Plaintiff was seen putting something into the parking meter. Exhibit 1 at 48:2-21. Exhibit 2 at 74:19-22 and 71:20.

6.    Aaron Gamble opened the parking meter and showed the piece of paper that had been "jammed " into the coin track of the parking meter to Plaintiff. Exhibit 2 at 76:18-22.

7.    Officer Carter believed that Aaron Gamble had a totally unobstructed view of Plaintiff at the parking meter and had no reason to question Mr. Gamble's observation. Exhibit 1 at 48:22 and 49:3-9.

8.    Officer Carter had reason to believe that Plaintiff had committed the crime and acted in accordance with his belief when he arrested her. Exhibit 1 at 51: 7-16.

9.    Officer Kenneth Boone testified that when he first arrived on the scene, Officer Carter had already initiated contact with Plaintiff. Exhibit 4, Deposition of Kenneth Boone at 20:15-22 and 21:1.

10.    Officer Boone testified that when he arrived on the scene, he did not see anything that struck him as an improper or unlawful arrest. Exhibit 4 at 71: 14-18.

11.  Officer Boone testified that based upon what he observed at the scene, he reasonably believed that Plaintiff had committed a crime.  Exhibit 4 at 73: 12-20.

12.  Plaintiff testified that she did not put any paper in the parking meter and that the arresting officers were mistaken to think so.  Exhibit 3, Deposition of Nefretitti Makenta at 40: 7-14.

13.  Plaintiff testified that the officers informed her that she was being arrested because she had put paper into the parking meter.  Exhibit 3 at 40:19-22.

14.  Plaintiff testified that she was told that she was being arrested because somebody said they saw something, but that whatever the officers were told about what somebody saw, they were mistaken.  Exhibit 3 at 41:10-15.

15.  Plaintiff testified that she made it difficult for the officers to handcuff her. Exhibit 3 at 29:3-10.


                    Respectfully submitted,


                        /s/ Frederick D. Cooke, Jr.
                    _____
                    Frederick D. Cooke, Jr., D.C. Bar No. 164608
                    Rubin, Winston, Diercks, Harris & Cooke, LLP
                    1155 Connecticut Avenue, NW, Suite 600
                    Washington, D.C. 20036
                    202 861 0870
                    202 429 0657 (facsimile)

                    Counsel for ACS Government Systems, Inc.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NEFRETITI MAKENTA,**                )
                                      )
      Plaintiff,                )
                                      )
                                      )     Civil Action No. 06-1093 (JR)
vs.                                   )
                                      )
**DISTRICT OF COLUMBIA, et al.,**     )
                                      )
      Defendants.               )

## <u>ORDER</u>

    Upon consideration the motion for summary judgment filed herein by Defendant ACS

Government Systems, Inc. ("Defendant ACS"), the supporting memorandum of points and

authorities, any opposition thereto, and the record herein, it is this _____ day of

_____, 2007 ORDERED that the motion is hereby GRANTED; and it is

    FURTHER ORDERED, that judgment as a matter of law is hereby entered in the above-

captioned matter in favor of Defendant ACS.


                                     _____

                                       Judge James Robertson