IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NEFRETITI MAKENTA,**           ) | |
|           Plaintiff,           ) | |
| v.           ) | Civil Action No: 06-1093 (JR) |
|           ) | |
| **DISTRICT OF COLUMBIA,** *et al*.           ) | |
|           ) | |
|           Defendants.           ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT ACS's
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, Nefretiti Makenta ("Makenta"), by and through undersigned Counsel and respectfully opposes Defendant ACS's Motion for Summary Judgment ("motion"). This Opposition incorporates the attached Plaintiff's Statement of Material Facts in Dispute.

In support of Plaintiff's Opposition to Defendants' motion, Plaintiff contends that genuine issues of material fact exist as to whether ACS employee Aaron Gamble ("Gamble") or any other ACS employee actually inspected the subject parking meter prior to Plaintiff's arrest, whether ACS employee Gamble actually observed Plaintiff insert paper into the parking meter at issue or observed paper in the meter after Plaintiff's arrest, and whether he thus falsely stated to D.C. police on the scene that Plaintiff had done so and therefore committed a criminal act which justified her arrest and imprisonment.

1

I.  **FACTUAL BACKGROUND**

Plaintiff is a journalist-film maker who at all times referenced here in was working on a documentary for PBS. Deposition of Nefretiti Makenta, at 9:1-6, Ex. 3. On April 12 2005, she parked her car in 2100 block of H Street, NW in order to go to the George Washington University Media Center Id. While trying to put money in the meter, the quarter became stuck. Id. at 15:1-3. Plaintiff then used one of the other quarters to try to push the quarter down. Id. at 15:4-7. As a result, the meter registered "fail." Id. at 15:8-22. Plaintiff then walked to the George Washington University Media Center, which had not yet opened. Id. at 17:10-13. When she returned to her car she was stopped by (3) to (4) unidentified men and told that she was observed putting paper in the meter. Id. at 21:14-18. She responded that she did not put paper in the meter and asked them to look at the quarter in the meter which proved this. Id. at 23: 18-22, 24: 1-2.

The record does not establish that both Gamble and Paul Hudson ("Hudson") checked all the meters. Exhibit 2 Aaron Gamble Dep. at 45-46 . Aaron also did not remember how the meters were checked. When asked this question, Officer Carter indicated that he was unsure: Q. Do you know if you and Aaron (ACS) checked the meters on the side of the street where incident occurred with Ms. Makenta. A. No, I can't say that for sure. Q. Ok, so you don't know whether you and Aaron were on one side or whether Paul was on that side, is that correct? A. That's correct. *Id*. at 50. There is no evidence in the record which confirms that the meter of issue was checked by either Gamble or Hudson. Gamble testified that he could not recall whether the meter at issue was a meter that he personally inspected. Exhibit 2, Gamble Dep. at 82: 3-11. Carter

did not confirm or verify Aaron's inspections of any meters. He only "assumed" that he did. *Id,* at 86: 10-21.

.   No paper was ever produced during either the criminal procedure nor during this civil procedure. Plaintiff in her request for production of documents requested same. Exhibit 3 Makenta Dep. at 57: 1-6. Although he says that he opened the paper, Carter could not describe any basic features about this piece of paper. He could not say whether it was eight by eleven, whether it was white, or whether it was thick or thin. Exhibit 1, Carter Dep. at 39: 18-22 and 40:1-4. To add a further cloud over this issue, Officer Carter's PD81, (property record), indicates that there were two pieces of paper. *Id.* at 40:21-22, 41:1-3.

II.   **STANDARD OF REVIEW**

Summary Judgment is only appropriate where the pleadings and the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial responsibility of demonstrating an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 472 Us 317, 323 (1986). The moving party may successfully support its motion by "informing the district Court of the basis for its motion, and identifying those portions of the pleadings, depositions, and answer to interrogatories with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.*

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all reasonable inferences in the non-movant's favor.

*Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 255 (1986). A non-moving party, however, must to establish more than the "mere existence of a scintilla of evidence in support of its position. *Id.* At 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex,* 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly, probative, Summary Judgment may be granted." *Anderson,* 477 U.S. at 249-50. Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]". *Id*. at 252.

### III.   ARGUMENT

#### A.  Introduction

The facts in this case show clear dispute among the parties. Moreover, the analysis applicable to this particular defendant is distinct from the analysis applicable to the D.C. police officers. Based upon the record herein, the officer, David Carter, acted based upon Aaron Gamble's representation that Plaintiff inserted paper into the meter at issue. All other allegations as to the previous inspection of the meter by either ACS or a D.C. police officer are hotly disputed based upon the officer's and ACS's testimony. As will be demonstrated below, absent Gamble's representation, arguably, the District of Columbia would not have had either probable cause to arrest Plaintiff or qualified immunity.

The remaining case is thus about whether Defendant's statement to the police that Plaintiff inserted paper into the meter, which caused Plaintiff to be arrested, was true and accurate. Plaintiff submits that the evidence herein does not irrefutably support

4

Defendant ACS's contention in this regard and that genuine issues of material fact exist which should preclude an award of summary judgment on all claims.

### B. Significant credibility issues preclude summary judgment.

There are three primary fact witnesses in this case, and the record shows significant differences in their factual assessments. Furthermore, the factual variations raise obvious credibility tensions which should be resolved by a jury not a judge. As such, a summary judgment ruling on this record would clearly result in reversible error. According to *In re Estate of Walker*, 90 A.2d 216, 221-222, our appellate court determined in a summary judgment context as follows:

> that "[i]f 'the case turns on controverted facts and the credibility of witnesses, the case is properly for the jury.' " *National R.R. Passenger Corp. v. McDavitt,* 804 A.2d 275, 280 (D.C.2002) (citing *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979)) (quoting *Aylor v. Intercounty Constr. Corp.,* 127 U.S.App. D.C. 151, 155, 381 F.2d 930, 934 (1967)); *see also Uckele v. Jewett,* 642 A.2d 119, 124 (D.C.1994) ( "resolution of witnesses' 222 credibility is an issue left to a jury"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he [or she] is ruling on a motion for summary judgment [.]"). "If the witness has an interest in the outcome of a case, and ⋯ if evidence opposing [a] presumption is contradictory or reasonably subject to contradictory interpretations[,] *the question becomes one for the trier of the facts.*" *Uckele, supra,* 642 A.2d at 124 (quoting *Davis, supra,* 492 A.2d at 887) (other citation omitted) (emphasis in original).

*Fact disputes as to Carter or ACS's actual inspection of the meter*

Defendant ACS's argument is premised upon the fact that Officer Carter enjoyed an independent basis upon which to determine probable cause and to make an arrest. The record, however, does not support this contention. Rather, it shows that the only basis determinable, as a matter of law, upon which Carter legitimately acted was Gamble's representation that he observed Plaintiff illegally inserting paper into

5

the meter. (See Exhibit 3 at 40).

In actuality, Officer Carter had no personal knowledge at the time of the arrest as to which meters had been checked on the side of the street where Plaintiff was arrested. See Exhibit 1 at 55: 10-15. He testified that both Paul Hudson and Gamble checked the meters. Id. at 53: 15-18. However, we do not know whether Hudson checked any meters at all as he has not testified in this case. We do know based upon Carter's testimony that Gamble did not check all of the meters. Id. at 55: 1-15. In this connection, Gamble testified that he could not recall whether the meter at issue was a meter that he personally inspected. Exhibit 2 at 82: 3-11.

We do know that both Gamble and Hudson checked the meters. Id. at 45-46. Gamble also did not remember how the meters were checked. Id at 50:    When asked this question Officer Carter indicated that he was unsure:

> Q. Do you know if you and Aaron (ACS) checked the meters on the side of the street where incident occurred with Ms. Makenta.
>
> A. No, I can't say that for sure.
>
> Q. Ok, so you don't know whether you and Aaron were on one side or whether Paul was on that side, is that correct?
>
> A. That's correct

Gamble also states that the officer had to visually confirm the meter's inspection. In this instance, there were allegedly two (2) simultaneous ACS inspections going on, but only one police officer on the scene. Based upon Carter's deposition testimony, he did not confirm or verify Gamble's inspections of any meters. He only "assumed" that he did. Id. at 86: 10-21. Hence, there are genuine fact issues in dispute as to whether

6

Officer Carter enjoyed an independent basis for determining probable cause; simply stated, he had no actual knowledge or reasonable basis to believe that the meter at issue had been previously checked prior to Plaintiff's depositing one o r more coins therein. Therefore, the true basis for his determination as to probable cause was that Gamble represented to him that he observed Plaintiff insert paper into the meter.  To be certain, absent Gamble's observation, simply because the meter failed would not give the officer reason to make an arrest.

### *Fact disputes as to Carter's factual basis for probable cause finding*

While Officer Carter testified that he saw plaintiff putting "objects" in the meter, he had no personal knowledge as to what those objects were.  He stated: "I just did not know what was actually being put in the meter." Deposition of David Carter, at 37: 19-22 at Exhibit 1.   Moreover, Carter testified that ACS employee Gamble, who was part of the surveillance team, told him that he actually observed plaintiff putting "paper" in the meter to render it inoperable. *Id.,* at 48: 16-21; 49: 14-17.  The only indisputable and reliable factual predicate for Officer Carter's determination of probable cause and subsequent arrest of Plaintiff is Gamble's representation that he observed Plaintiff insert paper into the meter.  Plaintiff, however, submits that she did not and that Gamble's observation and representation is patently false.

### *Fact disputes as to Carter's observation of paper in the meter*

Defendant contends that Officer Carter observed a piece of paper in the meter. 38:13-17.   There are several major factual problems in this regard.  First and foremost, no paper was ever produced during either the criminal or civil cases.  Officer Carter's deposition testimony further raised a cloud over his credibility.  Although he says that he

7

opened the paper, he could not describe any basic features about it. He could not say whether it was eight by eleven, whether it was white, or whether it was thick or thin. Exhibit 1 at 39: 18-22 and 40:1-4. Further, Carter's PD81 (property record) indicates that there was two (2) pieces of paper. Exhibit 1 at 40:21-22, 41:1-3.

### *Fact disputes as to Gamble's observation of Makenta approaching the meter*.

Gamble testified that he was about five cars away from Plaintiff when she first arrived. Exhibit 2 at 56 1:3. He further testified that when she exited the vehicle, she walked directly to the parking meter. Id. 56:9-10. He adds that he was "positively certain" that Plaintiff did not go to the vendor after she exited the vehicle. Id. at 81: 20-22, 82: 1-2. On the contrary, Plaintiff testified that she parked her vehicle, and then proceeded to the nearby vendor, who was located about two car lengths away on the same side of the street. Exhibit 3 at 12-13. She adds: "Specifically, I asked him if he had anything for a quarter because I only actually–I was only going to get him to get change, and I told him that. Id. at 13: 16-21. Plaintiff purchased a blow-pop and received seventy-five cents change: two quarters, two dimes and one nickel. Id. at 14: 1-3, 10-18. Gamble further testified that it was at that time that Plaintiff inserted the paper into the meter. Notably, he testified that she appeared to make a movement like a "tearing mode" and he saw the placement of "something" into the meter. Exhibit 2 at 57: 4-14 and 65: 4-10. Gamble did not even recall a hot dog stand being on the same side of the street on which the incident occurred. Id. at 60:15-22.

Additionally, Gamble admits that he could not see the meter's response to Plaintiff's actions. He was not close enough. Id. at 70:13-19. He also admits, consistent with Plaintiff's testimony, that there is some type pf change in the meter. Id. 72:2-3.

8

*Fact disputes as to paper versus quarter was in the meter's entry area*

Gamble testified that he observed paper in the meter from an external observation and suggested that the officer observed the paper. Id. at 74: 19-22. He also suggests that the paper was observed in the coin track on the front end, which suggests that it was observed at the entry. Id. at 109:6-12. Gamble also does not recall the color of the paper. Id. at 77: 17-19. He does not remember whether it was folded or even whether it was torn. Id at 117: 6-18.

Plaintiff testifies otherwise. After securing change, she walked to the meter and tried to put a quarter in the meter. The quarter became stuck at which time she attempted to use one of the other quarters to "try to push the quarter in, down." Exhibit 3 at 14:19-22, 15:1-7. The quarter remained stuck and the meter failed. Id. at 15:8-20. It was then that Plaintiff walked away. According to Plaintiff, there was a quarter in the entry of the meter rather than paper. Id. at 23: 16-22, 24:1-16. Her testimony flatly refutes ACS defendant Gamble.

    C.    **Genuine issues of material fact exist as to the false arrest claim.**

The arrest in this case occurred substantially because this defendant, ACS, falsely stated to a D.C. police officer that he observed this Plaintiff insert paper into a parking meter. This issue is placed in factual contention based upon the record thus far adduced in this case. Defendant discusses the false arrest issue from the perspective of Officer Carter, but does not respond to its predicate role in causing the false arrest at issue by making a false statement to the officer.

In *Vessels v. D.C*, 531 A. 2d 1016 (1987), the D.C. appellate court found that an informer who knowingly gave false information to a police officer necessarily interfered

with exercise of officer's independent intelligent judgment and discretion and thereby became liable for false arrest that later occurred. This case is analogous to the facts of the immediate case. This record shows that the officer's decision to arrest Plaintiff was substantially, if not exclusively, based upon Gamble's statement that he observed Plaintiff insert paper into the meter.

That court has also determined that liability is incurred of a false arrest and imprisonment if by acts or words, one directs, requests, invites, or encourages the unlawful detention of another. *Smith v. Washington Hospital Center*, 399 A2d 213, 218 (1979). Indeed, in this case genuine issues of material fact exist as to whether the officer would not have made the arrest at hand without the direction and invitation of ACS and particularly the assertion that Plaintiff illegally obstructed the meter with paper. Hence, viewing the facts in a light most favorable to Plaintiff, the court should deny Defendant's motion

### D. Genuine issues of material fact exist as to whether ACS acted under color of state law.

*Defendant's actions here bring it within the ambit of acting as a private entity under the color of state law and therefore exposes Defendant to section 1983 liability. Defendant admits that the enterprise at issue was essentially a joint police action between the police and ACS, a government contractor. See Defendant's Statement of material facts not in dispute at paragraph* 1: "ACS, in conjunction with Metropolitan Police Officer Carter, was part of a surveillance operation…."

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v.*

*Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). Courts generally treat " 'under color' of law ... as the same thing as the 'state action' required under the Fourteenth Amendment," *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769-70, 73 L.Ed.2d 418 (1982) (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)), and state action "may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself," *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (internal quotation marks and citation omitted). "[A] challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents." *Id.* at 296, 121 S.Ct. at 930 (internal quotation marks and citations omitted).  Invariably, the private actor acted as a willful encouraging participant in the immediate  enterprise.  Moreover, Defendant does not question or challenge this issue.

### E.    Genuine issues of material fact exist as to ACS's section 1983 liability.

Defendant operates on the erroneous premise that if there is qualified immunity for the District, then it enjoys similar protection.  However, it is settled law that private parties, such as ACS who may be sued under 42 U.S.C**.** § 1983, are not entitled to claim such immunity.  In 1992, the Supreme Court decided that private defendants who are subject to § 1983 liability are not entitled to claim a qualified immunity defense. *Wyatt v. Cole,* 504 U.S. 158 (1992).  The Supreme Court in Wyatt granted certiorari to resolve a

11

conflict among the courts of appeals over whether private defendants threatened with § 1983 liability are, like certain government officials, entitled to qualified immunity from suit. The U.S. Supreme Court in an opinion by Justice O'Connor explained that it determined who was entitled to immunity by reference to the common law. "If the parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1971," the Court would infer that Congress intended to incorporate those immunities unless policy dictated to the contrary. *Id.* at 104. The Court then determined that private defendants charged with § 1983 liability are not entitled to qualified immunity.

Turning to policy, the Court found that the rationales supporting immunity for government agents did not apply to private parties. In an extensive analysis of the Court's prior decisions establishing the contours of qualified immunity in the context of § 1983 liability, the Court concluded that the "special policy concerns involved in making government officials" *Id.* at 167, and the "rationales mandating qualified immunity for public officials are not applicable to private parties." *Id.* The Court explained that providing qualified immunity to government officials protected those officials who were attempting to serve the public good by preventing the threat of damages from deterring individuals from entering government service. *Id.* The Court explained that those rationales were not applicable to private defendants because private entities did not hold office requiring them to exercise discretion and because the public good was not at stake when private parties acted. *Id.* at 168. The Court summarized its legal analysis as follows: "In short, the nexus between private parties and the historic purposes of

qualified immunity is simply too attenuated to justify such an extension of our doctrine of immunity". *Id.* at 514-515 [Emphasis, added.]

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Court relied upon much of the same analysis in Wyatt and found that private prison guards were not entitled to immunity. In Richardson, the Court first found no history of immunity for private corrections officials. *Id.* at 405. The Court also relied on evidence that the common law provided prisoners with remedies against mistreatment at the hands of private actors. *Id.* The Court also found strong policy consideration did not justify providing immunity, even though the role of a prison guard, in many ways, involved important aspects of law enforcement. *Id.* at 409. As the Court explained, private companies also had greater opportunities to regulate their employees' conduct that state employers did. *Id.* at 410. In sum, the Court concluded that even though the prison guards were performing a function that, in many instances, is performed by government officials, they would not extend qualified immunity to private entities.

Many other counts confronted with this issue have consistently denied private parties qualified immunity, holding that *Wyatt* and *Richardson* preclude granting private persons immunity from suit in the context of § 1983 claims. In *Manis v. Corrections Corp of America,* 859 F. Supp. 302 (M.D. Ten. 1994), the District Court determined that *Wyatt* was controlling and denied qualified immunity to the Corrections Corporation of America. The *Manis* court concluded that "[a] private party that performs a government function for a fee" does not face the dilemma of a public officer who might run afoul of the Constitution in seeking to serve the public. *Id.* at 305.

The U.S. Supreme Court's holding in *Richardson* and *Wyatt* extend to facts and circumstances directly present in this case. Here as in *Richardson,* the Court explained that "[t]he case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Richardson*, 521 U.S. 399, at 413. Hence, the court's ruling as to qualified immunity is of no moment to ACS in light of the clear application of *Wyatt* and *Richardson* to the facts of the case. Private security guards, private prison guards, private doctors, and private parties in general are simply not entitled to qualified immunity.

### F. Genuine issues of material fact exist as to Plaintiff's defamation claim.

Defendant ACS argues that Plaintiff was not defamed by the false allegations made by Gamble. This argument, however, is without merit. In order to state a cause of action for defamation in the District of Columbia, relevant case law mandates that plaintiff must allege four elements:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement, without privilege, to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

***Blodgett v. University Club*** 2007 WL 2261586 (D.C. 2007).

Plaintiff alleged that ACS employee Gamble made false, incriminating statements to Officer Carter concerning Plaintiff which led to Plaintiff's arrest. Defendant has failed to demonstrate or prove that such statements were not made by Gamble. Further, Gamble's actions by making such false statements were not only negligent but they were unsubstantiated and with reckless disregard to Plaintiff.

14

Defendant ACS also argues that Gamble's statements did not injure Plaintiff in her trade, profession, community standing, or lower her in the estimation of the community. This claim is false and unfounded. Plaintiff has suffered irreparably in her trade, profession, and community standing. She was not only arrested and detained, but she was embarrassed and terrified. She is now forced to carry this badge of shame, to wit the arrest, with her for the rest of her life. It is documented and in the public record and will negatively affect Plaintiff as she attempts to advance in her career.

Lastly, Defendant ACS argues that any statements made by Gamble that directly resulted in Plaintiff's arrest were made under qualified privilege. This is not the case. As Defendant argued, in the District of Columbia, a qualified privilege exists when a statement about suspected wrongdoing is made in good faith to law enforcement authorities. *Curry v. Giant Food Co.*, 522 A.2d 1283, 1294-1295 (D.C. 1987). This is not the case. Plaintiff alleged that Gamble's statements were not only false, but were also unsubstantiated and therefore made in bad faith. When such facts are in dispute, it then becomes a question of fact to be decided by a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Further, although Defendant ACS contends that Gamble's statements were true and made in good faith, Defendant has failed to establish or prove that the statements made by Gamble were not false and not made in bad faith. Said issue should be decided by the jury.

**G. Genuine issues of material fact exist as to Plaintiff's IIED claim.**

To the extent that Defendant ACS knowingly and intentionally made a false statement about her putting paper in the meter, such false statement arguably would

15

constitute an outrageous act, particularly if the actor was aware that it would cause Plaintiff's imprisonment.

### IV. CONCLUSION

For the aforementioned reasons, this court should deny Defendant's motion.

Respectfully submitted,

_____/s/_____
Donald M. Temple # 408749
TEMPLE LAW OFFICES
1229 15th Street, NW
Washington, D.C. 20005
(202)628-1101

Counsel for Plaintiff
